896 F.2d 1421
 SOUTH CAROLINA NATIONAL BANK, Plaintiff-Appellee,
v.
ATLANTIC STATES BANKCARD ASSOCIATION, INC., Defendant-Appellant.
SOUTH CAROLINA NATIONAL BANK, Plaintiff-Appellant,
v.
ATLANTIC STATES BANKCARD ASSOCIATION, INC., Defendant-Appellee.
ATLANTIC STATES BANKCARD ASSOCIATION, INC., Plaintiff-Appellee,
v.
CENTRAL FIDELITY BANK, N.A., Defendant-Appellant.
ATLANTIC STATES BANKCARD ASSOCIATION, INC., Plaintiff-Appellant,
v.
CENTRAL FIDELITY BANK, N.A., Defendant-Appellee.
 Nos. 88-1363, 88-1372, 88-1611, 89-1403.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 2, 1989.
Decided Feb. 28, 1990.
 
 Ralph Francis Gray (John R. Jordan, Jr., Jordan, Price, Wall, Gray & Jones, on brief), Jeffrey Claude Howard (Ralph M. Stockton, Petree, Stockton & Robinson, on brief), for defendant-appellant in No. 88-1363.
 Manton McCutchen Grier (William C. Boyd, Sinkler & Boyd, P.A.; L. Henry McKellar, Associate Gen. Counsel, on brief), for plaintiff-appellee in No. 88-1363.
 Robert W. Spearman (Lisa M. Nieman, Adams, McCullough & Beard, on brief), for defendant-appellant in No. 88-1611.
 Jeffrey C. Howard (Ralph M. Stockton, Petree, Stockton & Robinson, on brief); William R. Shenton (John R. Jordan, Jr., Jordan, Price, Wall, Gray & Jones, on brief), for plaintiff-appellee in No. 88-1611.
 Before MURNAGHAN and SPROUSE, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.
 MURNAGHAN, Circuit Judge:
 
 
 1
 The plaintiff, The South Carolina National Bank ("SCN"), has brought an action for an accounting of the "termination fee" assessed by the defendant, Atlantic States Bankcard Association, Inc. ("ASBA"), when SCN terminated its membership in ASBA. Central Fidelity Bank, N.A. ("CFB") and ASBA have been engaged in a struggle over many of the same issues, as well as a few others, prompted by ASBA's calculation of CFB's termination fee. We heard the cases seriatim and now consolidate them for disposition in a single opinion, there being several areas where the issues overlap. District Judge Karen Henderson presided over the SCN case; District Judge W. Earl Britt over the CFB case.
 
 
 2
 We begin by describing the structure and relationship of the various parties. ASBA was organized in 1968 as a North Carolina not-for-profit corporation. ASBA provides credit card processing services to its members who are financial institutions or merchants. Each member pays fees based on the services ASBA provides. Atlantic States Bankcard Properties Association, Inc. ("Properties"), was organized in 1968 as a separate North Carolina for-profit organization. Properties' sole business purpose has been to acquire real and personal property for lease to ASBA. ASBA leases all of its real property and most of its personal property from Properties. Atlantic States Bankcard Services Association, Inc. ("Services"), was organized in 1976 as a North Carolina not-for-profit corporation. Services was established to enable ASBA to process VISA transactions for those ASBA members issuing VISA cards. It was necessary to form Services as a separate entity because, at that time, VISA required all members of any association that processed VISA transactions to be members of VISA. Because some of ASBA's members did not issue VISA cards, ASBA could not process VISA transactions directly for those members who did issue VISA cards without violating VISA's rule. Under a service agreement between ASBA and Services, ASBA has processed all VISA transactions for Services' members in exchange for a fee paid by Services to VISA. The boards of directors of ASBA, Properties and Services are usually identical and meet on the same date. However, ASBA and Services each operates under its own set of Rules and Regulations ("Rules").
 
 
 3
 SCN is the surviving institution resulting from a merger between SCN and First National Bank of South Carolina ("First National"). That merger was consummated on December 1, 1984, whereupon SCN assumed all of First National's rights and obligations. Prior to the merger of First National and SCN, First National, an issuer of both VISA and Mastercard, was a member of both Services and ASBA. Also prior to the merger, SCN issued only VISA cards and was a member neither of Services nor, obviously, of ASBA.
 
 
 4
 Consistent with their respective rules, both ASBA and Services assess a termination fee to any institution that terminates its membership. The termination fee provision in the ASBA Rules, around which most of the controversy in this case turns, is found in Section 7.03(I). That Section reads as follows:
 
 
 5
 Any Principal Member whose membership shall terminate, whether voluntarily or otherwise, shall be liable for, and shall pay to [ASBA] its pro rata share of the present value of all real property and personal property or equipment leases, all computer program leases or any other contract, lease or obligation existing as of the date of termination binding upon [ASBA] for a term greater than thirty (30) days which are not otherwise reflected in [ASBA's] retained earnings figure or retained earnings deficit figure. The term "present value" as used herein shall mean a sum which if allowed to accrue interest at the rate of six (6%) percent per annum from the date of termination until the end of the lease term or obligation shall equal the total amount of all base rentals or other base payments due over the remaining term of the lease, contract or obligation, provided, however, that the remaining term of any real property lease shall be computed as five (5) years, notwithstanding the actual remaining term of such obligation.
 
 
 6
 The "pro rata share" of any terminated Principal Member shall be the resulting figure determined by multiplying the present value of each such contract, lease or obligation existing at the date of termination by the fraction that results from dividing the total of all sales slips and cash advance slips, including any electronic transactions, generated by cardholders of all members of [ASBA] for the twenty-four month period prior to the date of termination into the total of all sales slips and cash advance slips, including any electronic transactions, generated by cardholders of the terminated Principal Member for the same twenty-four month period prior to the date of termination. When the terminated Principal Member issues Visa cards and is also a member of [Services], all MasterCard and Visa card transactions processed by ASBA will be counted in computing the total volume of all sales and cash advance transactions generated by the cardholders of all members of [ASBA]; furthermore, both MasterCard and Visa card transactions of the Principal Member will be counted in computing the volume of sales and cash advance transactions generated by the cardholders of the terminated Principal Member.
 
 
 7
 (Emphasis added to identify provisions added by the 1982 amendments to Rules).
 
 
 8
 On November 28, 1984, several days before the merger of First National and SCN, First National notified ASBA that it would terminate its ASBA membership effective August 31, 1985. On October 25, 1985, two months after the termination of First National's (and therefore SCN's) ASBA membership, ASBA sent SCN a computation of its termination fee.[1] The amount of the fee asserted was $629,581.00. By letter dated March 28, 1986, ASBA made formal demand on SCN for payment of its termination fee. On September 3, 1986, ASBA sent SCN a revised computation of its termination fee.[2] In the interim, ASBA had appointed, and received the report of, an ad hoc committee to review ASBA's termination fee provisions. As a result of the application of the ad hoc committee's recommendations, the revised computation was $755,180.39, approximately $125,000 more than the first fee as initially computed by ASBA. On February 25, 1987, SCN paid ASBA $392,210.00, the amount SCN, according to its own calculations, considered to be the correct termination fee.
 
 
 9
 Judge Henderson ruled on the particular issues discussed in detail below and then recalculated the termination fee based on her rulings of law. The recalculation resulted in a fee calculation of $311,462.17. Judge Henderson then awarded ASBA prejudgment interest on that recalculated fee. She concluded that SCN was entitled to the difference between that amount and the amount that SCN had paid to ASBA on February 25, 1987.
 
 
 10
 CFB was a member of ASBA until April 30, 1985, when CFB terminated its membership. On April 9, 1986, ASBA initiated an action, seeking $1,505,504.00 as a termination fee from CFB. As in the SCN case, ASBA recalculated CFB's fee based on the ad hoc committee's recommendations and on December 18, 1986, ASBA filed an amended complaint increasing the fee claim to $1,811,523.69. Judge Britt awarded ASBA a termination fee totaling $1,323,065.31 plus interest, calculated consistent with his rulings.
 
 
 11
 We now discuss the several issues, specifying for each the case or cases to which the discussion pertains.
 
 
 12
 * Roughly, Section 7.03(I) of the ASBA Rules calls for calculation of a termination fee by multiplying ASBA's outstanding obligations by a fraction representing the terminating bank's pro rata share of those obligations. In the SCN litigation, Judge Henderson concluded that VISA card transactions should be included in the denominator for determination of SCN's pro rata share for purposes of calculation of its ASBA termination fee. We agree.
 
 
 13
 When calculating both the initial and the revised termination fee claims for SCN, ASBA did not include in the pro rata share denominator its total VISA transactions over the twenty-four month period preceding SCN's termination. Exclusion of the VISA transactions from the pro rata share denominator increased the termination fee because it decreased the amount by which ASBA's total obligations were discounted. Thus, exclusion of the VISA transactions was financially beneficial to ASBA. Conversely, inclusion of the VISA transactions in the pro rata share denominator would have been financially beneficial to SCN because it would have increased the amount by which ASBA's total obligations were discounted.
 
 
 14
 Because we must interpret the contractual language of the ASBA Rules in order to determine the propriety of excluding VISA transactions from the pro rata share denominator, general propositions of North Carolina contract law govern our analysis.[3] Under North Carolina law, a court's primary purpose in construing a contract is to ascertain the intent of the parties at the time of the contract's execution. Lane v. Scarborough, 284 N.C. 407, 409-10, 200 S.E.2d 622, 624 (1973). "Where the terms of the contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party thought the agreement to be." Crockett v. First Federal Savings & Loan Ass'n of Charlotte, 289 N.C. 620, 631, 224 S.E.2d 580, 588 (1976). "However, if the language is uncertain or ambiguous, the court may consider all the surrounding circumstances, including those existing when the document was drawn ... and the construction which the parties have placed on the language, so that the intention of the parties may be ascertained and given effect." Century Communications, Inc. v. Housing Authority of City of Wilson, 313 N.C. 143, 145-46, 326 S.E.2d 261, 264 (1985). As shown below, an application of these general contract law tenets to Judge Henderson's factual findings leads us to our conclusion that VISA card transactions should have been included in the pro rata share denominator.
 
 
 15
 Examination of Section 7.03(I)'s language reveals that it is ambiguous with respect to inclusion in the denominator of VISA transactions for an ASBA member that, like SCN, has not processed VISA transactions through Services. According to the first sentence of the second paragraph of Section 7.03(I), the denominator should include transactions, within the relevant time frame, "generated by cardholders of all members of ASBA." As noted by Judge Henderson, the key phrase "generated by cardholders of all members of ASBA" is ambiguous for two reasons. First, the words themselves are inherently ambiguous in that the term "cardholders" is qualified by neither "Mastercard" nor "Mastercard and VISA." The presence of "Mastercard" as a qualifier would lead to ASBA's urged interpretation of the contract; the presence of "Mastercard and VISA" as a qualifier would lead to SCN's urged interpretation of the contract. The absence of a qualifier creates ambiguity, leading us to conclude that the words "cardholders of all members of ASBA" could either include or exclude VISA cardholders.
 
 
 16
 Like Judge Henderson, we reject ASBA's contention that "cardholders" unambiguously means "Mastercard cardholders" for a second reason. Such an interpretation would arguably conflict with the first paragraph of Section 7.03(I) which provides that each member of ASBA should pay its "pro rata " share. Generally, the sum of pro rata shares equals the value of whatever is being divided on a pro rata basis. Under ASBA's interpretation, the sum of the pro rata shares of ASBA's obligations could exceed the value of ASBA's obligations. An additional conflict with the pro rata share language under ASBA's urged interpretation arises from the fact that pro rata share generally suggests adherence to some fixed standard. ASBA's urged interpretation would create one standard for members of ASBA who used Services to process their VISA transactions and another standard for members who did not.
 
 
 17
 Although the ambiguities do not preclude ASBA's interpretation of the contract, they do force us to examine extrinsic evidence to determine the parties' intent. Here, several of Judge Henderson's factual findings come into play. First, she found that "the purpose of ASBA's termination fee is to relieve the remaining members of long-term commitments [ASBA] assumes in order to process the volume of transactions expected from the terminated member." Second, she found that one of the two purposes of the 1982 amendments to the ASBA Rules' termination fee provision was "to require that VISA transactions be included in the computation of termination fees.... Thus, the directors hoped to make the termination fee computations 'fairer' and to place all members of both associations 'on an equal footing.' The idea was to use a formula that assessed a termination fee based on the percentage of the total transactions that the terminating member generated." Third, she found that, "both before and after the 1982 amendments, ASBA had calculated termination fees based on membership in ASBA only by using a ratio of the terminating member's Mastercard and private label transactions to the total Mastercard, private label and VISA transactions processed by ASBA." We conclude, as Judge Henderson did, that these facts constitute extrinsic evidence indicating that the parties intended to include VISA transactions in the pro rata share denominator so that a terminating member's termination fee would reflect that member's share of all of ASBA's obligations.
 
 
 18
 ASBA argues that Judge Henderson's crucial factual findings, from which our conclusion follows, are clearly erroneous. ASBA first argues that the intent of the 1982 amendments was not to establish some broad sweeping equitable principle of equal footing for all members as Judge Henderson found. Instead, ASBA contends, the 1982 amendments appended the additional sentences to Section 7.03(I) simply to insure that a bank that was a member of both ASBA and Services paid a termination fee that took into account that bank's VISA transactions as well as its other transactions. Thus, ASBA argues, Judge Henderson clearly erred when she interpreted the amendments as representing some broader aspiration to equality across the board. Accordingly, ASBA claims, the 1982 amendments have no application to SCN's case because they concern Services, of which SCN was not a member.
 
 
 19
 It is true that the 1982 amendments discuss only members of both ASBA and Services. However, given Judge Henderson's trial exposure to the testimony of individuals involved in the amendment process (and, of course, the ambiguity in the Rules that the amendments created), ASBA's mere recitation of the words of the amendments is not enough to disturb her finding that a deeper intent to create overall equity underlay the amendments. It is also worth noting that the minutes of the ASBA Board of Directors Meeting at which the amendments were passed state:
 
 
 20
 Another topic covered in President Register's report was the request to amend the Bylaws and Rules and Regulations to include Visa transactions as well as MasterCard transactions in computing the pro-rata share of leases, contracts and other obligations to determine the amount of the termination fee.
 
 
 21
 The statement contains no mention of a desire to restrict inclusion of the VISA transactions to the termination fees of members of Services and ASBA by excluding them from the termination fees of members of ASBA only. We can not say that Judge Henderson's factual findings as to the intent of the 1982 amendments were clearly erroneous.
 
 
 22
 As a second element of its attack on Judge Henderson's factual findings, ASBA argues that her finding that it was ASBA's past practice to include VISA transactions in the denominator for terminating members of ASBA only was clearly erroneous. ASBA dissects Judge Henderson's citation to the testimony of J.D. Davis, the ASBA representative who calculated termination fees and who described two prior termination fee calculations for other terminating members. One such calculation was for Bankers Trust, a bank that issued both VISA and Mastercards and terminated before the 1982 amendments. ASBA correctly points out that the final pro rata share ratio used for the Banker's Trust termination fee calculation omitted VISA transactions from the denominator. However, it is also true that the termination fee worksheet shows that ASBA at least contemplated using a ratio that included VISA transactions in the denominator. Judge Henderson also relied upon the termination fee calculation for First Virginia Bank Roanoke-West ("First Virginia"), a Mastercard only bank which terminated membership prior to adoption of the 1982 amendments. ASBA does not dispute that the calculation did include VISA transactions in the denominator, consistent with Judge Henderson's finding. However, ASBA argues that the fact that First Virginia, because of its small pro rata share, eventually paid the minimum termination fee of $25,000 reduces the relevance of the calculation with regard to the inquiry into ASBA's past calculation practices.
 
 
 23
 Judge Henderson's finding as to ASBA's past practice survives ASBA's challenge. Although ASBA can muster a colorable argument that reliance upon the Banker's Trust example was somewhat dubious, the presence of evidence that ASBA at least contemplated inclusion of VISA transactions prevents ASBA's challenge from meeting the clearly erroneous standard. ASBA's challenge to the First Virginia example is even less fruitful because the mere fact that the minimum termination fee was eventually assessed does not change the fact that in determining whether the calculated termination fee would be higher than the minimum fee, ASBA included VISA transactions in the denominator. Furthermore, there is evidence in the record of additional calculations, not cited by Judge Henderson, that included VISA transactions in the denominator.
 
 
 24
 Finally, ASBA, attempting to respond to Judge Henderson's observation that its urged exclusion of VISA transactions from the denominator could cause the sum of the pro rata shares to exceed total obligations, contends that one must not "ignore the business reality that ASBA seeks to encourage membership in both Associations and thereby increase the total volume of transactions it processes." It is therefore reasonable, ASBA argues, for it to offer a better deal for members of both associations as compared to members of only ASBA. However, in the absence of any evidence in the record of a desire for the 1982 amendments to implement such a business strategy (and ASBA points to none), it is difficult to accept ASBA's claim that the parties intended an uneven distribution of pro rata shares to effect an enticement for membership in both associations. Although ASBA's observation makes some sense from the perspective of ASBA's unilateral objectives, the issue before us is the intent of both the parties at the time of contract.
 
 
 25
 Given the weaknesses of ASBA's challenges, we affirm Judge Henderson's conclusion that the parties intended to include VISA transactions in the termination fee denominator. Her conclusion follows logically from her adequately supported factual findings regarding the purposes of the 1982 amendments and ASBA's past practice.II
 
 
 26
 Next we turn to the question of whether to exclude from the calculation of ASBA's obligations a contract between ASBA and Systematics, Inc. ("Systematics"), which contract did not provide for minimum or base payments. In the SCN litigation, Judge Henderson concluded in favor of exclusion; in the CFB litigation, Judge Britt concluded in favor of inclusion. Judge Britt further assigned to the Systematics contract a present value of $1,840,702.62 for purposes of the calculation of CFB's termination fee.[4] For the reasons set forth below, we agree with Judge Britt.
 
 
 27
 Prior to the membership termination of both SCN and CFB, ASBA entered into a contract with Systematics for the development of computer software for use in processing credit card transactions. The contract was initially to expire after thirty months, although ASBA and Systematics subsequently agreed to extend the original thirty-month term. Under the contract, ASBA's obligations to Systematics were as follows:
 
 
 28
 Payment.... [ASBA] agrees to pay [Systematics] for its services in developing the software on a monthly basis.... Payments shall be made pursuant to invoices submitted to [ASBA] by [Systematics] and shall be due within ten (10) days following [ASBA's] receipt thereof.
 
 
 29
 . . . . .
 
 
 30
 Payment Limit; Termination Rights. (a) To the best of [Systematics'] knowledge information and belief total payments by [ASBA] for the completed Software ... will not exceed $3,500,000 and, regardless of the number of hours expended by [Systematics], [ASBA] shall not be obligated to pay more than that amount in the absence of a written amendment to this agreement.
 
 
 31
 ASBA attempted to include just under $3.5 million in the calculation of its total obligations when determining CFB's and SCN's termination fees. As of the end of the expiration of the original thirty-month term, ASBA had paid Systematics $1.8 million for work pursuant to the contract.
 
 
 32
 CFB and SCN protest inclusion of the Systematics contract as an obligation in their respective termination fee calculations. Under Section 7.03(I) of the Rules, the termination fee is to equal a pro rata share of the "present value" of ASBA's obligation. CFB and SCN point to the second sentence of Section 7.03(I), which defines "present value" as the amount which, after an interest adjustment, equals the total of all "base rentals or other base payments" due over the remaining term of the ASBA obligation in question. The banks argue that the absence of base rentals or other base payments under the Systematics contract precludes the contract's inclusion in a termination fee calculation. Under Section 7.03(I)'s definition of present value, they contend, the present value of the Systematics contract is zero. The same reasoning led Judge Henderson to exclude the Systematics contract from SCN's termination fee calculation.
 
 
 33
 ASBA calls our attention to the word "obligation" in the first sentence of Section 7.03(I). ASBA argues that only an unreasonably narrow interpretation of the word "obligation" would permit exclusion of the Systematics contract from the termination fee calculations. As noted above, Judge Britt sided with ASBA on this issue, holding that the Systematics contract should be included in CFB's termination fee calculation.
 
 
 34
 Once again, we confront ambiguities in the ASBA termination fee provisions. The first sentence of the first paragraph of Section 7.03(I), providing that each terminating member shall be liable for its pro rata share of the present value of any contract binding on ASBA at the date of termination, would seem to include the Systematics contract insofar as it calls for inclusion of a portion of any contract. However, the second sentence of the paragraph, describing the method for calculating present value, provides no method for calculating present value for contracts such as the one at issue here. It thus seems that the ASBA Rules are ambiguous as to whether they intend to include contracts such as the one with Systematics.
 
 
 35
 Given the ambiguity of language, we must seek other indicia of the intent of the parties. The first sentence of the first paragraph of Section 7.03(I) does not limit the includable obligations in any way that would preclude the Systematics contract and, therefore, militates in favor of including the Systematics contract in the termination fee calculation. That broader sentence, describing generally the items that should be included in the calculation, is a better indicator of the parties' intent as to what obligations should be included than the second sentence, which seems to be no more than a method of calculating present value. Although our conclusion compels us to order inclusion of the Systematics contract in the fee calculation, we still face the problem of deciding what amount to use in that calculation in light of the problem of projecting, at the time of termination, the future total payments that ASBA would make to Systematics. However, an equitable solution rather than an inequitable one is indicated. As Judge Britt concluded, the amount spent during the original term of the contract, $1.8 million, is a fair approach to calculation.[5]
 
 
 36
 In passing, we note our rejection of CFB's contention that Judge Britt violated the doctrine of issue preclusion by resolving the issue of inclusion of the Systematics contract differently from the way Judge Henderson had previously resolved it.[6] We first point out that the doctrine's concern for preservation of judicial resources is inapplicable here because the second trial was completed by the time the first decision was issued. Although it is true that avoidance of inconsistent judgments, another rationale underlying the issue preclusion doctrine, is relevant despite the contemporaneousness of the trials, CFB's argument nonetheless fails due to our reversal of the decision of Judge Henderson upon which CFB claims Judge Britt should have relied. In I. T. & T. v. G. T. & E., 527 F.2d 1162 (4th Cir.1975), the district court had dismissed a complaint on the basis of claim preclusion in light of a prior decision by another federal district court. After that dismissal, a federal appeals court reversed the first decision upon which the second decision had relied. At that point, we reversed the second decision in light of the invalidity of the first decision that was the basis of the second decision's claim preclusion ruling. I. T. & T. v. G. T. & E. has been interpreted to stand for the proposition that "a second judgment based upon the preclusive effects of the first judgment should not stand if the first judgment is reversed." 18 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction Sec. 4433, at 311 (1981). See also Adams v. Jonathan Woodner Co., 475 A.2d 393, 397 (D.C.App.1984) ("Reversal of a decision renders it invalid, and application of collateral estoppel clearly should not be based upon an invalid decision" so second judgment must be reversed on appeal where relied upon judgment has also been reversed); Ornellas v. Oakley, 618 F.2d 1351, 1356 (9th Cir.1980) (same).
 
 
 37
 Because we have concluded that Judge Henderson resolved the issue incorrectly, i.e., that the Systematics contract should be included in ASBA's obligations, we would have to reverse any issue preclusion effect Judge Britt would have originally lent Judge Henderson's decision. Therefore, to the extent, if any, that issue preclusion doctrine was applicable to Judge Britt's initial decision (a point we do not decide), it simply has no effect at the present stage of the litigation.
 
 III
 
 38
 ASBA included in the termination fee calculation for both CFB and SCN certain obligations for which ASBA had arranged prior to the banks' respective termination dates but which did not become binding on ASBA until after those dates. We hold that those obligations must be excluded from the termination fee calculation.
 
 
 39
 ASBA's degree of commitment at the time of termination under the obligations at issue took several forms. In the SCN litigation, ASBA had included the leases in its capital budget prior to SCN's termination even though the leases were dated after that termination date. The CFB litigation involved several different kinds of commitment. One kind consisted of purchase orders that ASBA had placed prior to CFB's termination but that did not create a legally binding obligation until after the termination. Another consisted of Properties' honoring of a request from ASBA to purchase furniture and equipment for a new ASBA office building. Properties purchased the furniture and equipment prior to CFB's termination but, as of that time, ASBA had not entered into a legally binding lease for the furniture and equipment. The last obligation at issue in the CFB case is the "Third Lease Amendment" ("Amendment"), an amendment to ASBA's office space lease agreement with Properties, calling for improvements to that office space. Although the Amendment is dated prior to CFB's termination, it was not executed until after that termination.
 
 
 40
 Unlike the case of the two issues we have already addressed, here the contract provides unambiguous guidance. A straightforward reading of Section 7.03(I) leads to the conclusion that the leases should not be included because they were not "contract[s], lease[s] or obligation[s] existing as of the date of termination binding upon [ASBA]."
 
 
 41
 ASBA asks us to interpret the term "obligation" broadly enough to include the post-termination leases as items which were practically obligations, especially given the fact that it was ASBA's practice not to finalize its leases with Properties until the equipment was actually delivered. To do so would be to rewrite the terms of the contract which indicate clearly that terminating members are liable for their pro rata share only of contracts actually binding on ASBA at the date of termination. The Rules could have included, but do not include, leases for which ASBA has arranged but are not yet binding. Such a provision would be reasonable but it is not what the parties agreed to. Obligation vel non at the date of termination is what controls. There is no ambiguity in the contractual language, and, therefore, no need to examine the intent of the provisions. An obligation is not an obligation until one is obligated.
 
 
 42
 Accordingly, we affirm Judge Henderson's decision to exclude the leases dated after SCN's termination even though those leases were included in ASBA's capital budget at the time of termination. We affirm also Judge Britt's decision to exclude the purchase orders and the furniture and equipment leases. Finally, we reverse Judge Britt's decision to include the Third Lease Amendment which was not executed until after CFB's termination.
 
 IV
 
 43
 Prior to both SCN's and CFB's terminations, ASBA leased a building from Properties. In May 1986, after the termination of both banks, ASBA subleased office space in that building to a third party. When calculating each termination fee, ASBA included the amount that it owed under its lease without reducing that amount by the amount that ASBA was to receive from its sublessee tenant. Both Judge Henderson and Judge Britt held ASBA's decision to be proper. We affirm.
 
 
 44
 The crucial fact that leads us to affirmance is that the sublease from which the banks seek to benefit began after the banks had terminated their membership. As we held earlier (in the banks' favor) in the context of ASBA's attempts to include items for which legal obligations had not yet accrued, determinations of ASBA's contractual obligations are to be made as of the date of termination.[7] Therefore, because ASBA's subleasing of a portion of its building occurred after the banks terminated their respective memberships (and, therefore, after the date at which we must determine ASBA's obligations), the subleasing has no bearing on the termination fee calculation.
 
 
 45
 We do not address the issue of whether the banks would be able to benefit from the sublease if it had taken effect before their termination. Applying a straightforward reading of the contract, Judge Henderson and Judge Britt, in effect, held that even under those circumstances the lease obligation should not be offset by the sublease. As Judge Britt put it, "Section 7.03(I) [of the Rules] contains no provisions for credit for subleases. Had the members desired to include such a provision they certainly could have done so." We decline to consider the district courts' reasoning and the potential implications of landlord/tenant principles and contract doctrines such as mitigation of damages and liquidated damages. Instead we hold that the banks' argument must fail because the sublease post-dated the termination.
 
 V
 
 46
 Next, we affirm the decision of both district courts to require ASBA to use the compound interest method, rather than the annuity method, of computing interest for purposes of determining the present value of ASBA's obligations.
 
 
 47
 As has been noted above, between ASBA's submission of the first and second calculations of SCN's and CFB's termination fees, ASBA appointed an ad hoc committee to review its termination fee provisions and their application. The committee recommended that ASBA compute the present value of its obligations by using Table IV of the Accountant's Handbook of Formulas and Tables ("Accountant's Handbook"), which is based on the annuity method of determining present value. Previously, ASBA had been using Table II of the Accountant's Handbook, which is based on the compound interest method of determining present value. In fact, ASBA had used the compound interest method in determining the first termination fees for which it billed SCN and CFB. Pursuant to the ad hoc committee's recommendation, ASBA used the annuity method when it presented SCN and CFB with its second termination fee calculations.
 
 
 48
 Apparently, use of the annuity method results in a higher present value calculation because the method takes into account periodic payments made over the course of the overall time period in question (in this case the period from the date of the member's termination until the expiration of the particular obligation at issue). According to ASBA, "each monthly payment reduces the available principal upon which interest can accrue, thereby necessitating a larger principal (a larger sum) to satisfy the payments due over the life of the contract." According to ASBA's expert witness, the annuity method results in a more accurate present value calculation for situations in which there will be periodic payments.
 
 
 49
 In the SCN litigation, Judge Henderson made no finding as to whether the annuity method is more accurate than the compound interest method for computing present value on obligations requiring periodic payments. Instead, she looked to Section 7.03(I) of the Rules. She noted that the Rules define "present value" as "a sum which if allowed to accrue interest at the rate of six (6%) percent per annum from the date of termination until the end of the lease term or obligation shall equal" the total of all payments under the given lease or obligation. Judge Henderson assumed, without finding, that the annuity method was more accurate but then held that ASBA must use the compound interest method because:
 
 
 50
 [T]he express language of the [ASBA] Rules does not permit using an annuity method which takes into account the fact that interest would accrue on portions of an obligation only until a periodic payment is made. The clear language of this provision requires instead that a method be used which permits the whole amount of each obligation to accrue interest for the entire length of that obligation.
 
 
 51
 In the CFB litigation, Judge Britt held that ASBA was required to return to the compound interest method insofar as its computation of CFB's termination fee was concerned. He wrote:
 
 
 52
 During the course of the trial each party presented expert testimony supporting its contention as to which [method] more correctly calculates the fee under Section 7.03(I) of ASBA's Rules and Regulations. In spite of the explanation for the use of Table IV [the annuity method] provided by plaintiff's expert and attorneys, the court cannot say that Section 7.03(I) is not subject to other interpretations. Accordingly, the court holds that, insofar as the calculation of the termination fee for CFB, ASBA is bound by the interpretation it had placed on the provision for all terminating members prior to CFB and indeed the first interpretation it placed on the calculation for CFB itself.
 
 
 53
 We agree with Judge Britt. Unlike Judge Henderson, we can not confidently conclude that Section 7.03(I) proscribes use of the annuity method. However, given the apparent ambiguity of the contract provision's application to computation methods, it makes sense to hold ASBA to its former method of calculations, namely use of the compound interest method outlined in Table II of the Accountant's Handbook. In so holding, we remain consistent with the general contract law tenet that a court's interpretation of ambiguous provisions should be guided by the interpretation that the parties themselves have placed on it.
 
 VI
 
 54
 In the SCN litigation, Judge Henderson decided not to reduce SCN's termination fee despite the fact that ASBA had increased that fee after revising its computation of the present value of three contracts. We affirm.
 
 
 55
 When ASBA presented to SCN its second, or revised, termination fee calculation, it increased the present value of three contracts due to a recalculation of the remaining life of each contract.[8] Those contracts were the above-discussed contract with Systematics, a contract with Compact Data Systems ("CDS"), and a contract with Programming & Systems Inc. ("PSI"). ASBA's first termination fee calculation had used a figure of sixty months for the remaining life of each contract, while in the second calculation it used figures of twenty-four, ten and eleven months respectively. The contract with Systematics was dated January 24, 1985, seven months prior to SCN's termination, and called for work over a thirty-month period; the contract with CDS was dated July 3, 1985, approximately two months prior to SCN's termination, and called for work for a ten to twelve-month period; and the contract with PSI was dated July 11, 1985, and called for work for a twelve-week period.
 
 
 56
 As Judge Henderson noted, the remaining life that ASBA used for the CDS contract was accurate and the remaining life that ASBA used for the PSI was too long, thereby creating a benefit of a questionable nature for SCN. As for the Systematics contract, the twenty-four month figure is in fact slightly higher than the twenty-three month determination that ASBA could have used. Thus, once again, any deviation from accuracy benefited SCN, not ASBA.
 
 
 57
 In light of the fact that the second set of figures was either accurate or, to the extent it was inaccurate, favored SCN, we see no reason to disturb Judge Henderson's approval of ASBA's revision. SCN can muster little support for its request that we apply the plainly inaccurate figures used in the first calculation. Indeed, in its brief, SCN is reduced to arguing: "If there was a justification or an explanation for these increases, it should have been disclosed by ASBA in September of 1986 when it gratuitously recalculated the termination fee...." The recalculation plainly was not gratuitous; instead it corrected the errors of the first calculation. Needless continuation of error is not our objective.[9] First in time need not be first in right.
 
 VII
 
 58
 We affirm Judge Henderson's award to ASBA of prejudgment interest on the amount that SCN in fact owed as a termination fee. Judge Henderson allowed that interest to accrue from April 5, 1986, the deadline date for SCN's payment of its termination fee as specified by ASBA in its March 28, 1986, demand letter until February 25, 1987, the date on which SCN sent ASBA payment for the amount it considered to be a correct termination fee.
 
 
 59
 The award of prejudgment interest is based upon N.C.Gen.Stat. Sec. 24-5, which provides for recovery of prejudgment interest at the legal rate (eight percent) on the amount owed under a contract from the date of breach until payment. SCN argues that the award of prejudgment interest was improper in this case because the amount of the termination fee had been in dispute. SCN further contends that the fact that ASBA's demand for payment was for an unreasonable amount militates against allowing prejudgment interest to accrue. In the companion case, Judge Britt awarded prejudgment interest from the date that notice of the termination fee was presented to CFB to the date of judgment. CFB has not appealed that portion of Judge Britt's ruling.
 
 
 60
 We reject SCN's argument on the authority of Noland Co., Inc. v. Poovey, 58 N.C.App. 800, 295 S.E.2d 238 (1982). In that case, a jury returned a verdict for less damages than that for which the plaintiff had prayed. The defendant argued that the disparity between what the plaintiff sought and what the jury awarded indicated that the damages were not easily ascertainable and therefore no prejudgment interest should be allowed. The court rejected that argument. Similarly, the fact that the amount of the fee was in dispute in SCN's case does not absolve SCN of liability for prejudgment interest.
 
 
 61
 In addition to resting soundly on Noland, Judge Henderson's decision to award prejudgment interest makes eminent good sense. On April 5, 1986, SCN was definitely aware that it owed ASBA some amount for a termination fee. Based on its own theory of Section 7.03(I), it could have at that time calculated what it perceived to be an appropriate fee and sent it to ASBA (as it eventually did the following year).
 
 VIII
 
 62
 The final issue we consider, relevant only to the CFB litigation, concerns Judge Britt's decision to include ASBA's obligations for two IBM mainframe computers in the termination fee calculation. Over CFB's protestations, we affirm that decision.
 
 Judge Britt found the following facts:
 
 63
 Pursuant to recommendations from [an Arthur D. Little ("ADL") ] study that its main frame computers be updated, ASBA, in May of 1984, approved the lease of two Model 4381 computers from Properties. These computers were installed in June and August of 1984. After further study, consideration of the final ADL report and the needs of its members, ASBA, in November 1984, decided to further upgrade its computer capacity. Thereafter, proposals were sought from IBM and COMDISCO, an independent company which leases IBM equipment, for state-of-the-art equipment. At a meeting on 14 November 1984 ASBA's board of directors authorized the president, with approval of the executive committee, to acquire by purchase or lease all computer and related equipment to adequately support the needs of the company and convert ASBA's computer operating system from "DOS" to the more flexible "MVS" operating system. Thereafter, ASBA's management studied the present and projected needs of its members in relation to its equipment and concluded that the 4381 computers would not be sufficient to do the job. Accordingly, the executive committee, in December 1984, authorized the lease of two 3083 computers. On 18 December 1984 ASBA entered a lease with Properties for two IBM 3083 central processing units. The two computers were phased in in April and July of 1985.
 
 
 64
 In announcing his conclusion that the 3083s should be included in the termination fee calculation, Judge Britt did not directly address the reasonableness of ASBA's decision to lease them. CFB now argues that ASBA's decision was unreasonable and that, therefore, the computers should not be included as an ASBA obligation. ASBA relies upon the general contract law tenet that "implicit in every contract is the obligation of each party to act in good faith." Great American Insurance Co. v. C.G. Tate Constr. Co., 303 N.C. 387, 399, 279 S.E.2d 769, 776 (1981), rev'd on other grounds, 315 N.C. 714, 340 S.E.2d 743 (1986).
 
 
 65
 To support its position, CFB points to evidence in the record that the ASBA decision was inconsistent with the ADL report and that a computer expert testified that "it's not reasonable to have computers installed for four months and to make a decision to pull it." CFB also tries to discredit the various reasons ASBA presented at trial to justify its decision to lease the 3083s. Predictably, ASBA counters with reasons why the computer expert's credibility is questionable and why ASBA's decision was not inconsistent with the ADL report.
 
 
 66
 The decision as to the reasonableness of the purchase is highly fact-dependent and should not be faced by us on appeal, especially in light of the exhaustive familiarity with ASBA's business that such a finding would require. It also would question quite legal action when to do so would be highly questionable. Worth noting is the fact that, despite hearing testimony on the issue, the district court did not find the lease of the 3083s to be unreasonable and, indeed, implicitly found the acquisition of the 3083s to be reasonable since he included the decision to do so in the termination fee calculation. Furthermore, Judge Britt's description of the decision-making process leading up to the leasing decision, presented above, paints a picture of ASBA making a reasoned decision. Given those considerations, we reject CFB's challenge to Judge Britt's decision.
 
 
 67
 The two district court opinions are modified to make them consistent with this opinion. They are each, subject to such modifications,
 
 
 68
 AFFIRMED.
 
 
 
 [1]
 First National had terminated its Services membership in September 1984, several months before the merger was consummated. On December 14, 1984, Services sent First National a computation of its fee for terminating membership in Services. The amount of the fee was $70,037.00. That fee is not in dispute
 
 
 [2]
 Judge Henderson's inadvertent dating of the revision's formal demand as March 28, 1986, is of no significance for our purposes
 
 
 [3]
 Judge Henderson found that North Carolina law governs this action and neither party contests that finding
 
 
 [4]
 For convenience, subsequent references to the amount paid by ASBA to Systematics will state that amount as $1.8 million
 
 
 [5]
 CFB relies upon the general principle of contract law that the terms of a contract must be sufficiently definite for a court to enforce them. See Snug Harbor Property Owners Ass'n v. Curran, 55 N.C.App. 199, 203, 284 S.E.2d 752, 755 (1981), petition denied, 305 N.C. 302, 291 S.E.2d 151 (1982); Beech Mountain Property Owners' Ass'n v. Seifart, 48 N.C.App. 286, 295, 269 S.E.2d 178, 183 (1980). However, our analysis pays heed to the competing principle that the law "does not favor the destruction of contracts on account of uncertainty, and 'the courts will, if possible, so construe the contract as to carry into effect the reasonable intent of the parties, if it can be ascertained.' [citation]." Welsh v. Northern Telecom, Inc., 85 N.C.App. 281, 290, 354 S.E.2d 746, 751, review denied, 320 N.C. 638, 360 S.E.2d 107 (1987)
 
 
 [6]
 Judge Henderson had issued her decision about one month prior to Judge Britt's
 
 
 [7]
 To the extent that we did apply hindsight to our valuation of the Systematics contract, we were forced to do so because the contract did not provide unambiguous guidance to our valuation inquiry
 
 
 [8]
 A decrease in the remaining term of a contract increases the present value calculation because it decreases the amount of time over which interest can accrue
 
 
 [9]
 The calculation of the present value of the Systematics contract presents a special problem. Our earlier holding as to the value of the Systematics contract ($1.8 million) shall be interpreted to be equivalent to, under the language of the Rules, "the total amount of all base rentals or other base payments due over the remaining term of the lease, contract, or obligation." The present value (as of the date of termination) of the Systematics contract remains to be calculated (with use of twenty-four months as the remaining term of the contract and, of course, by means of the compound interest method)